### SMITH v. NEW YORK GRANITE PAVING BLOCK CO.

(District Court, S. D. New York.   March 26, 1892.)

DEMURRAGE—CONSIGNEE'S FAILURE TO FURNISH BERTH—BILL OF LADING.

The bill of lading under which a vessel carried a cargo of paving stones provided "that forty-eight hours after arrival at the port named in the bill of lading, and notice thereof to the consignees named, there shall be allowed for receiving such cargo one day for every seventy-five tons thereof, after which the cargo shall pay demurrage," etc.   The vessel duly reported on July 24th, but the consignees did not give her a berth until August 7th.   On suit brought to recover demurrage for that period, respondent claimed that there was no obligation on it to find the vessel a berth.   *Held,* that, while it is the ship's business to find a berth in the absence of any custom or evidence to the contrary, the circumstances of this case, and the construction evidently given to the bill of lading by both parties, showed that consignees were expected to furnish the berth. Libelant was therefore held entitled to recover.

In Admiralty.   Libel by James H. Smith against the New York Granite Paving Block Company for demurrage.   Decree for libelant.   Affirmed in 56 Fed. Rep. 527.

Owen, Gray & Sturges, for libelant.

Harriman & Fessenden, for respondent.

BROWN, District Judge.   The respondents were consignees of 400 tons of paving stones.   By the "Stone Bill of Lading" adopted in this case it was provided "that 48 hours after the arrival at the port named in the bill of lading, and notice thereof to the consignees named, there shall be allowed for receiving such cargo one day for every 75 tons thereof, after which the cargo shall pay demurrage at the rate of 6 cts. per ton a day," etc.

The master of the vessel duly reported at New York on the 24th day of July, 1891.   There being no vacant berth where the respondents were accustomed to receive paving stones, the schooner waited until the morning of August 7th, when the respondents gave her a berth.   Demurrage is claimed for this delay.   The respondents contend that the bill of lading imposed no duty upon them to find the vessel a berth, and that their only obligation was to receive, that is, to take away, 75 tons a day after the ship had found a berth and commenced the discharge.   The schooner was bound by the bill of lading to pay the expense of unloading the stones.

In the absence of any custom or evidence to the contrary, it is, no doubt, the ship's business to find a berth in the port of discharge. There is here no proof of custom; and the evidence upon which the cause has been submitted is so meager as respects the ship's duty, or the understanding of the parties, that I find some embarrassment in arriving at a decision.   In a port so extensive as the port of

New York, however, it is scarcely possible that in the transportation of so common a cargo as paving stones there should not be some custom, or previous practice having the force of custom, which determines the duty of the vessel as regards the place of unloading, and her right or obligation to find her own berth ad libitum. Considering the very greatly increased expense to the consignees of carting paving stones to the points where they are to be used, if the ship could unload wherever she might find a berth along the 15 or 20 miles of wharf line within the port around the island of New York, or on the opposite shore, it is not credible that this business has in fact been conducted in that way; because that would be unreasonable, and contrary to the well-known usages as regards other heavy cargoes of comparatively small value. In such a case, therefore, slight indications in the testimony, in the absence of anything to the contrary, ought to be held sufficient evidence to show the reasonable intention of the parties, namely, that the consignees of such a cargo were to have the right to receive it where economy and their own convenience should make it necessary that they should receive it, viz. at a wharf designated by themselves, with the corresponding duty on the part of the vessel to conform to their requirements.

In the present case the interviews between the master and the consignees seem to me to presuppose and to imply that the vessel was to go, of course, to a berth to be designated by the consignees. When the master reported, there was no intimation to him that he was to seek a berth of his own. On the contrary, he was to receive notice from the consignees when a berth was ready. When it was ready, he was so notified, and went to the designated berth and discharged accordingly. The implication from all this is, that the master was to wait till there was a berth to be had at one of the respondent's usual places of receiving paving stones.

The language of the bill of lading, moreover, which was a standard form expressly adopted for the purpose of regulating the discharge, is that there "shall be allowed for receiving such cargo, 48 hours after reporting arrival, one day for every 75 tons," etc. It is not an unreasonable or unnatural interpretation of the intent of this clause, having reference to the nature of the cargo and the necessary convenience and economy of the consignees, to construe it as meaning that the consignees were to have the control of the ship as respects the time and place of discharging, and at such a berth as they might designate; subject only to the payment of demurrage if the stipulated time allowed therefor was extended. The evidence, slight as it is, is sufficient to show that both parties acted upon that construction; and as that construction is a reasonable one, it should be sustained. District of Columbia v. Gallaher, 124 U. S. 505, 8 Sup. Ct. Rep. 585. Decree for the libelant, with a reference to ascertain the amount, if not agreed upon.